UNITED STATES of America, Appellee,

v.

Kenneth E. OLIVER, Defendant, Appellant.

No. 77–1181.

United States Court of Appeals, First Circuit.

Argued Nov. 11, 1977.

Decided Feb. 17, 1978.

James M. Pool, Boston, Mass., by appointment of the Court, for defendant, appellant.

David P. Twomey, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL and BOWNES, Circuit Judges, GORDON, District Judge.*

MYRON L. GORDON, District Judge.

The defendant-appellant Kenneth E. Oliver was convicted after a three-day jury trial of forcing another person to accompany him without that person's consent in the course of robbing the North End branch of the Security National Bank of Springfield, Massachusetts, a federally insured bank, in violation of 18 U.S.C. § 2113(e), as charged in count 3 of a three-count indictment. He was sentenced to 30 years' imprisonment, to be served consecutively to federal and state court sentences which he was serving when sentenced for this offense.

Mr. Oliver claims error in the district court's rulings (1) denying his motion for judgment of acquittal at the close of the Government's opening statement; (2) refusing to strike the testimony of the Government's witness Sharon Penfound; (3) denying him access to grand jury minutes; and (4) denying his motion for judgment of acquittal at the close of the Government's case. For the reasons stated below, we affirm the judgment of the district court.

The evidence at trial, viewed in a light most favorable to the government, may be summarized as follows: On November 23, 1971, the date of the offense, David Chernock, Priscilla Clemens, and Lawrence Carabine were employed as tellers, and Thaddeus Garczynski was employed as manager, of the North End branch of the Security National Bank in Springfield. David Chernock arrived at the bank on that day between 8:20 and 8:25 A.M. The bank was open for business from 9:00 A.M. to 3:00 P.M. Mr. Chernock parked his car in the parking lot behind the bank. As he started walking toward the bank, a car pulled up. The driver of that car pulled a gun and ordered Mr. Chernock to get into the vehicle. Mr. Chernock did so, crouching down

* Of the Eastern District of Wisconsin, sitting by designation.

in the front seat facing the passenger side of the car, as the driver ordered. With Mr. Chernock in this position, the car began to move. In response to the driver's questions, Mr. Chernock provided information about the identity of the bank's employees and the operation of the bank's security systems. The driver also demanded and received Mr. Chernock's wallet and keys. Mr. Chernock was then given an injection in the leg which rendered him unconscious. According to Mr. Chernock, the driver warned that "I'd better have given him the correct information because if he wasn't back in seven minutes to give me another needle, . . . I would die." Later that morning, David Chernock was found unconscious on the ground near a grocery store. He was hospitalized and released the following day.

Thaddeus Garczynski, the bank manager, arrived at work at 8:10 A.M. on November 23, 1971, and used a key to let himself into the locked rear entrance to the bank. Lawrence Carabine arrived at about 8:20 A.M. and Priscilla Clemens arrived a few minutes later, both using keys to enter through the locked rear door. After their arrival, Mr. Garczynski was confronted by a man with a gun, who announced that the bank was being held up. The man walked behind Mr. Garczynski, holding the gun toward him; he directed Mr. Carabine to fill a plastic bowling bag with money without activating any alarms. Mr. Carabine placed money from the bank vault into the bag. When the robber indicated that more money should be put into the bag, Mr. Carabine complied. The man then ordered Mr. Garczynski and Mr. Carabine to lie down on the floor near the vault, which they did, as he said "you'll hear from David within seven minutes."

When it seemed that the robber had left, the two bank employees got up and sounded the bank's alarm. Not more than 10 minutes elapsed between the time the robber entered the bank and the time the alarm was sounded.

Julio Ayala, a bank customer, was sitting in his car in the bank's parking lot on November 23, 1971, at 8:35 or 8:40 A.M., waiting for the bank to open. He observed a man leave the bank and walk toward a car, carrying what appeared to be a bowling bag. He described the individual he saw as a black male of husky build, weighing about 180 pounds, 5 feet, 9 or 10 inches in height, with black hair and sideburns. The man was wearing a tan coat.

David Chernock described the individual who ordered him into the car as a black male of 30 or 35 years in age, 5 feet, 9 or 10 inches tall, and weighing about 160 pounds. He stated that the man had short hair without sideburns or a beard and wore a coat. Mr. Chernock had an opportunity to observe the man for about 30 seconds when entering the man's car and also briefly before he was given the injection.

According to the bank manager the bank robber was a black man wearing a "London Fog type coat" and dark trousers. The robber had a round face, a natural or false beard, and straight black hair. He was 5 feet, 10 inches tall, weighed about 160 pounds, and wore glasses. At trial, Mr. Garczynski identified the robber in photographs taken during the robbery.

Bank teller Lawrence Carabine described the robber as a black male, 5 feet, 8 or 10 inches in height, having a heavy-set build, with dark eyes, wearing a tan trench coat, an artificial beard and hair piece, and tinted sunglasses.

Sharon Penfound, a former girlfriend of the defendant, testified that she met Oliver in 1968, had known him continuously since that time and was intimately involved with him until early 1972. During November, 1971, Miss Penfound saw the defendant at her apartment in Detroit, Michigan, in possession of a straight long black wig, a false beard, and fake sideburns. At that time the defendant was clean shaven except for a mustache. Also during that month, Mr. Oliver told Miss Penfound that he was planning to go to Springfield, Massachusetts, about a week before Thanksgiving. Miss Penfound thought defendant did go to Springfield, taking the wig, sideburns and beard. The defendant also told her that his

wife, who was a nurse, would obtain a tranquilizing drug that he planned to use "to sedate people at a bank."

Miss Penfound saw the defendant again in Detroit shortly after Thanksgiving, about a week after he had gone to Massachusetts. At that time he said that he had obtained $26,000 in the holdup of a savings institution. He gave $17,000 to Miss Penfound to keep for him. Sharon Penfound identified the defendant in court and also in photographs made during the robbery.

Richard S. Farley, a special agent assigned to the FBI's Detroit office from 1971 until March, 1976, testified that in February, 1976, he received a letter from the defendant requesting an interview with an FBI agent in order to discuss "a number of New England bank robberies." In response to the letter, Mr. Farley interviewed the defendant on March 1, 1976. At trial, agent Farley read his record of the defendant's statements at the March 1, 1976, interview. Agent Farley's record indicated that the defendant confessed to obtaining $31,000 in a November, 1971, robbery of the Security National Bank in Springfield, Massachusetts. The defendant told Mr. Farley that he forced a teller into his car, questioned him about bank security measures, took his keys, and gave him an injection. Following the robbery, the defendant put the teller out of the car behind a grocery store. Agent Farley identified the defendant in court as the man he interviewed in March, 1976.

After the jury found the defendant guilty of count 3, the court, with the concurrence of counsel, dismissed counts 1 and 2, which respectively charged the defendant with robbing a federally insured bank, in violation of 18 U.S.C. § 2113(a), and with assaulting and jeopardizing the lives of the bank's employees by the use of a gun in the course of such robbery, in violation of 18 U.S.C. § 2113(d).

## I. JUDGMENT OF ACQUITTAL AFTER GOVERNMENT'S OPENING STATEMENT

▮ The defendant claims that the trial court should have granted his motion for a judgment of acquittal after the Government's opening statement "because the prosecution failed to indicate in any way how it would prove the defendant specifically committed the bank robbery."

We have previously held that "the granting of such a motion is purely discretionary, . . ." *United States v. Capocci,* 433 F.2d 155, 158 (1st Cir. 1970). A judgment of acquittal should be granted after the government's opening only when the statement "clearly and affirmatively" shows "that the charge against the defendant cannot be sustained under any view of the evidence consistent with the statement." *McGuire v. United States,* 152 F.2d 577, 580 (8th Cir. 1945).

Here the Government in its opening outlined the expected testimony of the three bank employees and the bank customer. The Government represented that all of these individuals would identify the bank robber as a "Negro male". In addition, the Government said it would produce testimony of FBI agents and photographs of the robbery as it occurred. The prosecutor then indicated that he would prove by competent evidence that the defendant was guilty as charged of bank robbery.

It is apparent from this summary that the district court did not abuse its discretion in refusing to grant a judgment of acquittal following the prosecution's opening. The Government expressly stated that it would produce evidence showing that the defendant was guilty of the crime charged. Some of that proposed evidence was outlined in detail, while some of it was mentioned but not described. The district court cited this latter proposed evidence and the photographs of the bank robbery to which the Government alluded in rejecting the defendant's contention that the opening statement failed to link him with the crime. The determination to deny the motion on this basis was properly within the trial judge's discretion.

## II. STRIKING TESTIMONY OF SHARON PENFOUND

Mr. Oliver claims that the district court erred in denying his motion to strike the

testimony of Sharon Penfound. He charges that the Government withheld information about the existence and proposed testimony of this "key government witness", thus denying him due process and a fair trial.

Miss Penfound testified that she was interviewed by the FBI in 1972 regarding a Springfield, Massachusetts, bank robbery. The Government subpoenaed her as a witness about ten days prior to the commencement of trial. At trial, the Government's counsel represented that prior to February 22, 1977, the first day of trial, he had not intended to use Miss Penfound as a witness. He stated that she arrived from Michigan on February 22, 1977, and he first talked to her that afternoon. At about 1:40 P.M. that day, Sharon Penfound was shown photographs of the bank robbery, in which she was able to identify the defendant. The defendant's counsel was informed within fifteen minutes thereafter of Miss Penfound's identity and ability to make a photographic identification of Mr. Oliver.

The defendant advances several arguments in support of his claim that the Government was obligated to notify him of Sharon Penfound's existence prior to the first day of trial. Initially, he asserts that her identity and identification came within several specific demands for information which he had made in pretrial motions. In particular, the defendant points out that he asked the Government to provide (1) names, addresses, and statements of co-defendants; (2) names and addresses of any persons who actively participated in any manner in the matter of which he was accused and who furnished information to law enforcement officers; (3) information about the use of informants; (4) names and addresses of individuals who identified or failed to identify him in photographs; and (5) a list of its witnesses.

■ As to the first two requests, the fact that the defendant may have spoken to Sharon Penfound about the crime before its commission or given her money to hold for him afterward does not, under the circumstances of this case, make her a co-defendant or an active participant in the bank robbery. The Government therefore did not withhold information about her in representing that there were no co-defendants or active participants to be named.

■ It is likewise clear that Miss Penfound was not an informant. In *In re Post,* 496 F.2d 25, 26 (1st Cir. 1974), we quoted with approval the following definition of an informer set forth in *Gordon v. United States,* 438 F.2d 858, 875 (5th Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 140, 30 L.Ed.2d 56 (1971):

"Generally speaking, therefore, an informer is an undisclosed person who confidentially volunteers material information of violations of the law to officers charged with enforcement of that law. . . . *As we understand the term, persons who supply information only after being interviewed by police officers, or who give information as witnesses during the course of an investigation, are not informers.*" [Footnotes omitted; emphasis added.]

Since Miss Penfound gave information about the crime in the course of an interview with the FBI, she was not an informant whose identity the Government was obligated to disclose.

■ The magistrate denied the defendant's motions regarding photographic identification and for a list of the Government's witnesses. The Government notified the defendant's counsel promptly after Miss Penfound arrived and identified Mr. Oliver in bank robbery photographs. Under these circumstances, we cannot say that any such information respecting Miss Penfound to which the defendant may have been entitled was unjustifiably withheld from him.

■ Mr. Oliver also contends that the nondisclosure of Miss Penfound until the first day of trial "deprived [him] of potential exculpatory material." At trial, Miss Penfound testified that in 1972 she gave the FBI a statement indicating that Mr. Oliver told her that he had robbed a bank with another person. The defendant characterizes this as exculpatory information which the Government was constitutionally re-

quired to reveal. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The statement may be considered exculpatory in view of the evidence at trial suggesting that the robbery was committed by a person acting alone. However, because the defendant made only a general demand at trial "for all exculpatory evidence", the Government's failure to disclose this statement amounts to constitutional error only if, on a consideration of the entire record, the omitted material "creates a reasonable doubt that did not otherwise exist." *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). After considering the statement in conjunction with testimony by three bank employees, a bank customer, and an FBI agent, all to the effect that the robber acted alone, we cannot say that a reasonable doubt of the defendant's guilt is created that did not exist absent the statement. We therefore find no constitutional error in the Government's failure to disclose the statement.

Finally, under *United States v. Hathaway,* 534 F.2d 386, 402 (1st Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976), Mr. Oliver points out that the trial judge has discretion to remedy noncompliance with discovery orders. In *Hathaway,* we made reference to Rule 16(d)(2), Federal Rules of Criminal Procedure, applicable to noncompliance with the provisions of Rule 16. The defendant has failed to point out any part of that rule, and we find none, which would require the Government to produce the information sought here.

It therefore appears that Kenneth Oliver's rights were not violated by the Government's failure to disclose the identity, or identification, of Sharon Penfound before the first day of trial. It follows that the court properly refused to strike her testimony.

## III. GRAND JURY MINUTES

■ Mr. Oliver claims that the trial judge erred in denying his motion for production of the grand jury minutes. As grounds for this claim, the defendant asserts that the Government has attempted "to insulate its entire case from pre-trial discovery" by presenting different witnesses at trial from the one who appeared before the grand jury. The grand jury minutes should have been produced, he urges, so that he could ascertain the "quality of the hearsay evidence" submitted to the grand jury, whether the grand jury knew the evidence was hearsay, and whether the evidence presented included exculpatory material.

A claim that the indictment is based on hearsay is insufficient to meet the showing of particularized need prerequisite to ordering production of the grand jury minutes. *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *United States v. Llaca Orbiz,* 513 F.2d 816, 818–9 (1st Cir.), *cert. denied,* 423 U.S. 861, 96 S.Ct. 117, 46 L.Ed.2d 88 (1975); *United States v. Jett,* 491 F.2d 1078, 1081–82 (1st Cir. 1974). *United States v. Estepa,* 471 F.2d 1132 (2d Cir. 1972), cited by defendant Oliver, is inapposite to the instant situation. In *Estepa,* the court found that the grand jury was led to believe that it was presented eye-witness testimony, whereas the testimony was actually hearsay. Here, the defendant has suggested no basis for believing that the grand jury was misinformed about the quality of the evidence it was presented. Nor has he substantiated the bald assertion that the minutes may include exculpatory material not provided by the government.

We therefore conclude that the district court did not err in refusing to order production of the grand jury minutes.

## IV. JUDGMENT OF ACQUITTAL AFTER GOVERNMENT'S CASE

■ The defendant urges that the trial court should have granted his motion for a judgment of acquittal at the close of the Government's case. This motion was founded on Mr. Oliver's view that the Government presented no evidence connecting him with the robbery other than his own "uncorroborated statements" reduced to writing and read by agent Farley.

It appears that the defendant did not renew his motion for judgment of acquittal at the close of all the evidence. We have stated in the past that in this circuit such failure constitutes a waiver of the motion, and as a result Mr. Oliver must show "clear and gross" or "manifest" injustice in order to prevail here. *United States v. Kilcullen,* 546 F.2d 435, 441 (1st Cir. 1976), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977).

We are not persuaded that any manifest injustice resulted from the trial court's denial of the defendant's motion. Even under the lesser standard, it is apparent that

"a rational juror drawing reasonable inferences . . . from the evidence viewed in the light most favorable to the government . . . could have found guilt beyond a reasonable doubt." [Citations omitted.]

*Villarreal Corro v. United States,* 516 F.2d 137, 140 (1st Cir. 1975).

Mr. Oliver's argument amounts to an attack on the weight of the evidence presented by the Government to show that he was the bank robber. He claims that the agent's statement of the confession lacked specificity and was not preceded by a signed waiver of rights. The first contention was properly for the jury's consideration, and the second was resolved adversely to the defendant by the trial court, which found that he had been advised of his rights and had knowingly waived them.

Sharon Penfound identified the defendant as the bank robber in photographs taken as the robbery occurred. Here again, the defendant attempts to minimize the weight of her identification. It is apparent that based on agent Farley's testimony and Miss Penfound's testimony and identification, viewed in a light favorable to the Government, a rational juror could have found beyond a reasonable doubt that the defendant robbed the North End branch of the Security National Bank.

For these reasons, the judgment of the district court is affirmed.

AFFIRMED.